LONDON, ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, being sworn, and hereby states as follows:

1.     I am a member of the bars of Georgia, Louisiana and Mississippi, as well as of the United States Supreme Court and various lower federal courts.

2.     I make this declaration concerning the plight of the prisoners in Guantanamo Bay, and the problems that they face in obtaining meaningful access to courts.

3.     Everything I write in this affidavit is unclassified or not subject to the classification procedure.

4.     Respondents in these cases have recently filed to dismiss the habeas cases brought by various prisoners by next friends. *Respondents' Motion for Order to show Cause why Case should not be Dismissed for Lack of Proper 'Next Friend' Standing or, in the Alternative, to stay proceedings pending related Appeals and for Continued Coordination* (hereafter '*Respondent's Motion*').

5.     The next friends who are challenged are identified as Omar Deghayes, Jamal Kiyemba, Shaker Aamer, Bisher al Rawi, Usama abu Kabir, former detainee Moazzam Begg, all of whom are my clients. The only one who is not is the "one unnamed detainee." *Respondents' Motion, at 4*.

6.     The list of cases are as follows:

| Number | Petitioner | Next Friend Petitioner |
|---|---|---|
| 05-CV-1458(ESH) | Ahmed Doe | Omar Deghayes |
| 05-CV-1497(RCL) | Adil bin Muhammed al Wirghi | Moazzam Begg |
| 05-CV-1504(RMC) | Nabil | Jamal Kiyemba |
| 05-CV-1505(RMC) | Abbar Sufian al Hawary | Shaker Aamer |
| 05-CV-1506(RMC) | Shafiq | Jamal Kiyemba |
| 05-CV-1601(GK) | Hamid al Razak | Bisher al Rawi |
| 05-CV-1635(PLF) | Mohammed Akhtiar | 'Unnamed Detainee' |
| 05-CV-1704(JR) | Sadar Doe | Usama Abu Kabir |

7.     Respondents' position is difficult to accept for a number of reasons.

### Guantanamo Bay: The Background

8.      I first became involved in the representation (or attempted representation) of the prisoners in Guantanamo Bay in early 2002, because I believed strongly that this nation fails in its most profound promise when it holds prisoners beyond the rule of law.

9.      The prisoners are cut off from the world to an extraordinary degree. The isolation of the prisoners has been a cause of huge concern for families of missing persons across the world, as not everyone there is able to send or receive mail. Some family members do not know today – more than three years later – that their loved ones are in Guantanamo Bay. Indeed, one of my clients, who was apparently just fourteen at the time that he was seized in Pakistan, has never received any letter from his family in Saudi Arabia and still does not know whether his family know that he is alive.

10.     The fact that family members do not know who is truly in Guantanamo Bay is entirely the fault of Respondents. Like most of the problems faced by all parties to this process, this could be solved by the simple expedient of publishing the names and 'Internment Serial Numbers' (ISN's) of all prisoners. This, Respondents have steadfastly refused to do.

### The Extremely Difficult Challenge of Providing Prisoners with a Channel for their Legal Rights

11.     After initially bringing litigation on behalf of two British nationals and one Australian, the small group of lawyers involved in this litigation were joined by the twelve Kuwaitis, whose families got together to hire Shearman & Sterling. From the beginning, the U.S. military frustrated every effort to let the prisoners know their rights. For example, we asked the U.S. military to consent to merely informing the clients that they were represented in court, but Respondents refused even this meager measure. I learned from one of my British clients upon his release that they did not learn that they were represented for many months.

12.     Our small group of lawyers was just that – very small. Our resources were very limited. For example, I was working full time as director of a capital trial office, with a full docket of capital cases.

### Because the Military Would Not Even Reveal the Names of Those Being Held in Guantanamo, Trying to Identify the Prisoners Who Wanted Legal Assistance Was a Monumental Task

13.     The U.S. Military has thrown roadblocks in the way all along. To begin with, the government would not allow any lawyers to represent anyone. Thus, we had to begin by filing suit in the *Rasul* case, on February 19, 2002. It took almost two and a half years before the Supreme Court recognized the legal rights of the prisoners on June 28, 2004.

14.     The first problem in bringing any kind of systematic challenge to the lack of access to courts in Guantanamo Bay was that the U.S. military kept the identities of the

prisoners secret, so we had to work out who was there. To this day, the military has never made known the names of the prisoners on Guantanamo Bay.

15.     In coordination with various other people, I have conducted a project over more than three years merely to identify the names of the prisoners in Guantanamo. This was like completing a very complicated jigsaw. There have been over 750 prisoners from roughly 50 countries, who speak many languages. The only way that their names would come to light was if the home country published a list of their prisoners (provided presumably to the home government by the U.S.), or if the names would leak into the press from the families of the prisoners.

16.     Only a small minority of the prisoners (fewer than one percent, all now released) were nationals of European countries. More than 99% were from other countries scattered around the world.

17.     Most of these names came out in Arabic media, which made the work of identifying them that much harder. Often the name was misspelled in the Arabic newspaper to begin with, and then transliterated into English in a number of different ways. Thus, the task of sorting out the names of the prisoners was very difficult. Also, many foreign media outlets are not available on the internet.

18.     Even today, more than three years after we began, it has been impossible to get an accurate number even of the nationalities of the prisoners, let alone their names. As of August 31, 2005, the following table provides our best estimate of the numbers of prisoners who were from each country:

| Country | Approx. Number of Prisoners |
| --- | --- |
| Afghanistan | 88 |
| Algeria | 29 |
| Australia | 2 |
| Azerbaijan | 1 |
| Bahrain | 6 |
| Bangladesh | 2 |
| Belgium | 3 |
| Bosnia | 8 |
| Britain | 9 |
| Canada | 2 |
| Chad | 2 |
| Chechnya | 2 |
| Denmark | 1 |

| Egypt | 16 |
|---|---|
| Ethiopia | 1 |
| France | 12 |
| Georgia | 2 |
| Germany | 1 |
| Iran | 2 |
| Iraq | 2 |
| Jordan | 10 |
| Kazakhstan | - |
| Kenya | 1 |
| Kuwait | 12 |
| Libya | 19 |
| Maldives | 1 |
| Mauritania | 3 |
| Morocco | 34 |
| Pakistan | 65 |
| Palestine | 5 |
| Qatar | 2 |
| Russia | 9 |
| Saudi Arabia | 170 |
| Somalia | 1 |
| Spain | 1 |
| Sudan | 15 |
| Sweden | 1 |
| Syria | 10 |
| Tajikistan | 4 |
| Tunisia | 17 |
| Turkestan | 26 |
| Turkey | 17 |
| Uganda | 1 |
| Uzbekistan | 7 |
| Yemen | 147 |

19.    I would not pretend that these estimates are accurate. For example, I believe the total number of Yemenis is lower than 147, and the Saudi figure is lower than 170. The higher number is a result of various factors. First, when the media in the prisoners' home country published a list of Guantanamo prisoners, this would often include the names of other missing persons who had not actually been confirmed as being held in Guantanamo. Second, because the prisoners may use different names or nicknames, they might be duplicated. Third, there has been confusion over the prisoners' true nationality, particularly in Saudi Arabia where there are many foreign nationals who have lived there all their lives but do not technically hold Saudi nationality.

20.     At the same time, the list probably underestimates the numbers of other prisoners who have been held there. For example, I believe there should be at least 22 more Afghanis, given that the U.S. has recently announced that it plans to repatriate 110 Afghanis.

21.     There is a simple solution to our dilemma, if only Respondents would provide us with a complete list of detainees. This would allow us to build an accurate list of those who need legal services. However, Respondents have refused to take this basic step. It is very difficult to see how, three years into the Guantanamo Bay experiment, there can be any valid security concern in ensuring that we are all operating off an accurate list. Indeed, I could even help sort out the confusion if I was allowed to review a classified list.

22.     Under each nationality on our aggregate list we have the names of the prisoners. Again, I cannot guarantee the list to be accurate in any way. However, even though it is only our best estimate, the list does reflect the enormity of the task we have faced.

23.     As of June 2004, when the Supreme Court ruled, we had identified fewer than one third of the prisoners being held in Guantanamo Bay, and the names that we had for some of these prisoners were very questionable. Having the names was only the first step. Very rarely did the media identify any way to contact the family or friends of a prisoner, and tracking them down in a country such as Yemen was never going to be easy if we were operating from the United States.

### Rules Imposed by Respondents
### That Made Identification Much Harder

24.     Respondents suggest that demanding a more rigorous relationship between the prisoner and the next friend "would diminish the identification issues that have plagued the parties in the Guantanamo detainee litigation thus far." *Respondents' Motion, at 14.* This is simply not the cause of our problems. If Respondents would just identify the names which they believe to be the correct names of the prisoners, life would be much simpler. If they gave us a list, we could easily review it with our clients in Guantanamo Bay and identify the names of petitioners according to information known to Respondents.

25.     Indeed, I strongly suspect that we could help Respondents make their own list more accurate. While we have never been allowed to see the list of those Respondents believe to be in Guantanamo Bay, we do know that, after three years, Respondents have not even been able to identify the ages of many of the prisoners, let alone their proper names. For example, I have been told repeatedly in Guantanamo that my client M.C. is much older than he really is. This is because he secured identification that stated his age as older, because he could not otherwise travel without his parents. Respondents have made public statements about the ages of prisoners that seem highly inaccurate.

26.     We could also help clear up a great deal of confusion over nicknames. Arabic and Muslim culture encourages the use of nicknames – for example, the father of Imran may be called Abu Imran. One of my clients is known by at least six names, each of which is an innocuous nickname, rather than some kind of alias. Many prisoners prefer to be known by their nicknames in Guantanamo Bay. They feel that they have been humiliated, and they do not want some of the details of their humiliation to be known to their families, as this would cause the family member great distress. This applies particularly to the sexual humiliation that they have suffered. However we, as the lawyers, are in a position to clear up which are the real names and which are nicknames, if only Respondents would let us review a list.

27.     Respondents say that they have yet to identify two dozen petitioners, *Respondents' Motion, at 14*, and that there have been two counsel who went all the way to Guantanamo only to learn that Respondents had incorrectly identified their petitioners. *Respondents' Motion, at 14.* They seek to imply that this is somehow the fault of the lawyers involved.

28.     The fault, here, does not lie with Petitioners' counsel but with Respondents' rules. The only consistent method of identification was the ISN. However, the process of identifying people has been made radically more difficult by the fact, despite constant requests for a change in policy, Respondents deemed the ISN to be classified FOUO ('For Official Use Only') until July 7, 2005.[1] This meant that we could not ask our clients for the ISN and then put it in a central list of all the prisoners to crosscheck it. Each time I would get an authorization from a prisoner, I had to edit the ISN out before I could remove the authorization from the secure facility and provide it to counsel for filing a petition. When that petition was then filed, without the ISN, it was correspondingly more difficult to make the proper identification.

29.     Again, here, Respondents' insistence on secrecy makes no sense at all. The ISN is either a number (e.g., 000123) or a series of letters (e.g., JJJABC). The letters reflect the numbers (A=1, B=2, etc.). The series of letters appears on every piece of correspondence that the prisoner sends to his family, to the family will know the prisoner's ISN the moment they receive mail. Indeed, they are required to put the ISN on their replies.

30.     Thus, making the ISN classified made no sense, but made our task of identifying each prisoner to Respondents' satisfaction much more difficult. If Respondents are complaining, they must accept that they created this problem themselves.

---

[1] See *E-mail of Andrew Warden* (July 7, 2005) ("After further consultation on the subject, the Department of Defense has determined for the purposes of this habeas litigation only that the pairing of a detainee's name and the 3, 4, or 5-digit ISN for the detainee is no longer classified or subject to treatment as protected information under the applicable protective orders.").

### The U.S. Military Has Not Given Accurate Information
### About Prisoners Even to the Governments of Our Closest Allies

31.     The inaccuracy of Respondents' own data would seem to also be the cause of the misinformation that Respondents have given to other governments about the prisoners in Guantanamo bay. For example, based on what the U.S. has told them, the British government maintains to this day that there are only five British residents in Guantanamo Bay – Shaker Aamer, Jamil al Banna, Bisher al Rawi, Omar Deghayes and Jamal Kiyemba. I represent them all, and relied for a long time on the British government's assertion that these were the sum total.

32.     That reliance was misplaced. There are many other British residents among the prisoners, including Binyam Mohammed, Ahmed Errachidi, Abdulnour Sameur, Ahmed Ben Bacha, and apparently others whom I have not yet confirmed.

33.     The tragic case of Binyam Mohammed illustrates how hard it has been to secure authorizations from family members, based on the misinformation spread abroad by Respondents. Mr. Mohammed was a resident of the U.K., who had applied for political asylum from Ethiopia. His siblings all received asylum from the U.S., and are now U.S. nationals.

34.     When Binyam went missing from the world, his older brother and sister worked tirelessly to try to find him. They wanted to locate him and, had they known he was in prison, they would definitely have wanted to get him legal counsel. However, an FBI Agent actively lied to them, telling them that Binyam was not in U.S. custody and that the U.S. did not know where he was. The Agent, who left his card, was James R. Sobchack, Special Agent, Washington Metropolitan Field office, Washington, DC 20535 (phone 202-278-4352).

35.     This was false, as Binyam had been rendered from Pakistan to Morocco in a U.S. plane, where he underwent 18 months of horrendous abuse. Meanwhile, his brother traveled to England to try to find him. His sister distributed his picture as far afield as Pakistan, to no avail. He was 'missing' for more than two years, and they did not even learn he was in Guantanamo Bay until 2005, several months after he arrived there.

36.     Binyam himself, when he finally reached Guantanamo Bay about a year ago, tried all kinds of ways to get counsel. He asked other prisoners who had friends to ask them to contact lawyers. He got my address from another prisoner, and wrote to me – but it took months for the letter to get through. In the meantime, he also asked one of my clients to act as his next friend, and this is how I came to take up his case.

37.     Binyam is an educated person, who speaks English fluently, and who has even lived in the United States. Despite this, he found it impossible to achieve any

7

meaningful access to the courts before a petition was filed for him by the next friend process.

38.    His family were much better placed than 99 percent of the families of prisoners, as they lived in the U.S., so they could have found him counsel. Indeed, they would have secured him legal assistance but could not because they did not know where he was. The fact that it proved so difficult to identify, locate and help an educated prisoner from England with family in the U.S. merely illustrates the immensity of the task when it comes to other countries.

### Identifying the Family Members Was Even More Difficult

39.    If it was difficult to identify prisoners' names, it was even more difficult to identify and contact the families. While the media might identify the names of some prisoners, very rarely did the media identify family members. Part of the reason for this was the reticence among family members to be identified publicly.

40.    The problems for families contacting us were profound. First, they had to know that help was available, and there was no way that we were able to broadcast to families all over the world that they could contact us. Second, they had to have a means to contact us, and the internet is not readily available to many people in a country such as Yemen. Third, they would have to be able to contact us in English to have any chance of making contact.

41.    Indeed, I did not begin to receive an appreciable number of contacts from family members until recently, after I had done some media with Al Jazeera to try to raise the profile of the issues. Even so, I have received fewer than ten direct contacts from family members in the past year, without traveling abroad to try to find them.

42.    Even in the limited number of cases where family members have been able to establish contact inn this way, it has been difficult to maintain consistent e-mail contact, due to problems with the e-mail in places like Yemen. For example, I received the following on July 31, 2005, at 11:12:27 PM GMT+01:00:

Hi

Thank you Mr clivess for your send.

I am not spling english good sorry. ok i have may brother in coba goantnamo his name is tariek ali abdullah ahmad his from yamen. and i have may cazen his name mohamed abdullah mohamed al hemere. pls hilp hime and send me pls thank you very mash.

Mr. Yaseer Ali Abdullah Ahmad

It has not been possible to get a signed statement from Mr. Ahmad – indeed, I have not received a response to my full up e-mail. While this makes less difference here (it is clear that Mr. Ahmad has given authorization) the inability to get back in touch with other family correspondents had made it very difficult to get meaningful authorizations via e-mail or fax.

### Given That We Had to Go to Great Lengths to Facilitate Securing Counsel for the Prisoners or Their Families, Respondents' Allegation That We Have Been 'Soliciting' Clients Is Hard to Accept

43.    Respondents accuse volunteer counsel for the prisoners of "improperly abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients. . . ." *Respondents' Motion, at 14 n.11.*

44.    To be accused of 'soliciting' clients – presumably with overtones of ethical impropriety – is rather difficult to accept. Those of us who have been primarily responsible for securing authorizations from prisoners mainly work with two charities – my own, and the *Center for Constitutional Rights*. Virtually all of the other lawyers involved are working *pro bono* at great expense to themselves.

45.    Speaking for myself, and I believe for the other lawyers involved in this effort, the effort made on behalf of the prisoners in Guantanamo Bay has been solely directed at ensuring that they have legal assistance available, and has been extremely expensive. No representative of any prisoner has paid me for the assistance rendered.

46.    It must be borne in mind that the only reason we have to seek out any next friend for the prisoners is that Respondents have held them effectively incommunicado in Guantanamo Bay.

### Initially, the Only Way to Make Legal Assistance Available Was to Travel to Foreign Countries to Secure Authorizations to Represent Prisoners

47.    Respondents suggest that using 'friends' of the prisoners at Guantanamo is unnecessary because there are other ways to achieve the same ends. *Respondents' Motion, at 13* (citing 5 such examples).

48.    The implication is apparently that getting authorizations from family members is a simple alternative. This is not the case. Over the years, I have been responsible for filing various next friend petitions in capital cases in the United States, and on each occasion the next friend has been available within the United States, generally within the state where the petition has been filed. In contrast, with the prisoners in Guantanamo Bay, the family members were spread over 50 countries.

49.    I found early on in the process that the only realistic way to secure authorization from family members was to travel to each country to secure it.

50.     Given the lack of resources in our group, and a reasonable reticence on the part of some to travel to countries that were potentially hostile to a United States citizen, for many months I was the *only* volunteer counsel to travel around the Middle East seeking out the prisoners' family members and friends, and asking whether they wanted legal assistance. All of this had to be self-funded since Respondents opposed the appointment and funding of counsel.

51.     My first foreign trip (other than to Britain) was to Paris shortly before Christmas 2003. I was then living in New Orleans, and made this trip during my vacation. Through this, and other efforts, we were able to make contact with some of the French prisoners' families. They had French lawyers, making the task easier. I had to pay for this trip with no realistic hope of reimbursement from any U.S. government source.

52.     The European nationals constituted a small number of the prisoners, roughly twenty-two out of several hundred prisoners. Once we moved beyond Europe, the problem got much more difficult. There was the sheer size of the problem – there were reportedly about 350 prisoners from Afghanistan, Saudi Arabia, and Yemen combined, and many from various other countries outside Europe.

53.     There was also a significant issue of cost. Some countries only had one or two prisoners, and it would be prohibitively costly to go there to try to locate their families.

54.     I therefore first chose to visit Yemen, because it had a large number of prisoners. My first trip was to Sana'a, the capital of Yemen, in April 2004. Yemen is geographically quite large, and it is very poor. I visited the capital, but the prisoners' families were spread over the entire country. I had been warned prior to leaving that it could be dangerous to leave the capital and travel around the country. I would have been willing to risk it, but I had no way of knowing where the families and friends of the prisoners might be located.

55.     Thus, I had to figure out a way to get the 'next friends' to come to Sana'a. To do this, I had to hold a press conference upon my arrival so that the local media would make it known that families could come to my hotel. Given the obstacles, I thought the trip a great success when 'next friends' for 31 prisoners came to the hotel where I was staying, or provided authorizations to a local human rights group. However, this expensive trip only netted authorizations for fewer than one third of the prisoners.

56.     As of June 28, 2004, when the Supreme Court ruled in *Rasul*, my records reflect that we had authorizations for 45 'new' prisoners beyond those involved in the *Rasul* litigation: two of the remaining British nationals and two British refugees, three French, one Turkish resident of Germany, one Canadian, one Australian, one Syrian, three Algerians (who I had contacted through the Canadian wife of one of the Algerian prisoners), and 31 Yemenis.

57.     In July 2004, I then went to Bahrain. Again, I had to find funding for this trip since there was no chance that the U.S. government would assist in this effort. With the help of local Human Rights advocates, and the father of one of the Kuwaiti prisoners, in the week I was there we secured 33 authorizations. These come from Bahrain (6), Jordan (3), Libya (2), Qatar (1), Saudi Arabia (19), Syria (1) and Yemen (1).

58.     Again, this was an enormous amount of work. Again, we had to get information into the local media that I had come to Bahrain who could provide help to the prisoners, so that the friends and families would come to meet with me. I had to meet with various Bahraini government officials to ensure that the work would not be curtailed by the government.

59.     So desperate were people to help the prisoners in Guantanamo that nineteen Saudis crossed the border into Bahrain, and two other people who wanted to help prisoners flew in from Qatar and the United Arab Emirates when they heard on al Jazeera of the efforts we were making.

60.     In late August, my wife and I moved from Louisiana to London, which did not allow for much travel for a while.

61.     I next went to Jordan in October 2004. I had some concerns about going there because of its reputation as a repressive society. This was to prove prescient. When I arrived in Jordan, as usual I spoke with the media in order to get the word out to families and friends of the prisoners that I was there to offer help, since this was the only realistic way of making contact with the prisoners' families and friends. I mentioned that there was a dispute concerning the number of Jordanians in Guantanamo Bay, because my information indicated that there might be as many as 30. Some of these might be Palestinians, many of whom live in Jordan rather than the West Bank.

62.     When this appeared in the Jordanian media, I had an Arabic translator who was kindly helping me without charging me anything, and we had given out her contact details in the media. She received more than one hostile call from someone purporting to be with Jordanian Secret Service. The person who called her gave an apparently false name (Abu Mataz) and a telephone number. "Abu Mataz" started demanding what she was doing with me, and made various scandalous and false accusations against her and me. He demanded that we appear at the Secret Police headquarters at 6pm that evening. Before going, I asked an associate to seek consular assistance if I have not returned in two hours.

63.     The translator came with me. When we told the taxi driver that we wanted to go to the secret police HQ, he was very nervous and refused to take us to the gate. We had to walk the last part of the way, towards a well-defended building that housed the Secret Police. We were led into the white building, along a lengthy white corridor, with sporadic closed doors. It was nighttime, and totally silent. I will admit to being rather intimidated at this point.

64.      We were taken into a room with two men. I introduced myself, and asked their names. One of them, apparently the most senior, said rather melodramatically,. "We do not use names in this building."

65.      I wrote a description of him during the meeting. He was about 45-50, short, balding, reddish hair, and wore a very large and expensive looking watch. He did not speak much English, apparently, though he appeared to understand a fair amount. I later described him to a local lawyer, who immediately identified him as Colonel Ali Borjak, who is Director of the Terrorism Department of the Jordanian Intelligence Service. I was told that he is notorious – rightly or wrongly – for having tortured Al Zarkawi when the latter was held in Jordanian custody.

66.      Col. Borjak demanded to know why I had said in the newspaper that there were 30 Jordanians in Guantanamo. We had a discussion about this, and he seemed not to believe that I would have come that distance to offer free legal assistance to these prisoners.

67.      Hoping that bravado would help us out of an unpleasant situation, I told him that the Jordanian government was morally obligated to help me find the families and friends of the prisoners so that I could help them. Col. Borjak said that they did not know where most of the families are, and demanded that I share what I knew with him. This seemed improbable, given that he worked for the intelligence service. I was doubly nervous about his interest because the worst thing that could happen would be having the Jordanian Secret Police show up on the families' doorstep and intimidate them not to work with me.

68.      We were kept at the Secret Police HQ for the best part of an hour. This intervention emphasized the problems we face trying to help prisoners who come from a repressive state like this. On that trip, for all this trouble and expense, I was eventually able to secure authorizations for only two additional prisoners, although I was also able to meet the three families in person who had made contact with me in Bahrain.

**Foreign Government Interference with Access to Prisoners' Families**

69.      When it comes to interference by foreign governments with our efforts to offer help to the families and friends of prisoners, Jordan is by no means the worst offender.

70.      There are obvious examples of countries where one simply cannot imagine traveling there to meet with family members, either because I would not get a visa to go, or because the families would be placed in jeopardy if I went. These would include Algeria, Chechnya, Egypt, Iran, Iraq, Kazakhstan, Libya, Saudi Arabia, Syria, Tajikistan, Turkestan, and Uzbekistan.

71.      Saudi Arabia has been a good example of a country that has not only forbidden me from traveling there, but has also actively impeded our access to prisoners'

families. It was on a trip to Yemen in 2004 that I met with six lawyers from Saudi Arabia, headed by Ahmad Maszar. They were designated by the Saudi authorities as the 'legal committee' assigned to 'help' the Saudi prisoners in Guantanamo Bay. In fact they have consistently obstructed us from assisting the prisoners.

72.     I impressed upon Mr. Mazhar that it was very important to let the friends and families of the prisoners know that we could provide free legal assistance to them. I asked Mr. Mazhar if he could arrange a visa for me to come to Saudi Arabia to meet with family members. I said that I would come there at no cost to them, and find lawyers in the U.S. who would represent the prisoners at no cost. I said that alternatively the Saudi government could follow the lead of the Kuwaitis, and retain a firm they trusted in the U.S. The Saudi government had hired a firm (McKenna) to file an amicus brief in the U.S. Supreme Court, and I hoped that they might be willing to retain McKenna or another firm this time as well.

73.     Mr. Mazhar promised to consult back in Saudi and get back in touch with me. I continually tried to contact him when I returned to the U.S., with no success. He consistently failed to reply to my messages.

74.     On my Bahrain trip four months later, I prevailed upon Mr. Mazhar to come across the border so that I could continue in my efforts to persuade him, as the representative of the Saudi government, to cooperate in our efforts, at least by letting me come to Saudi and meet with people in the government and those who might be concerned about the prisoners. Again, Mr. Mazhar said that I would not be able to come to Saudi Arabia.

75.     I learned that the families and friends of Saudi prisoners were being reassured that they did not need to do anything on behalf of the prisoners because Mr. Mazhar's committee was taking care of it. This actively prevented the Saudi prisoners from getting meaningful representation, although the Saudi 'committee' was doing nothing to assist the prisoners secure legal assistance.

76.     In between my other responsibilities, these were the only trips that I was able to make up to October. I did go again to Jordan in November 2004, and Yemen in June 2005, but all of this travel cost a great deal of money, as well as time. The cost of these trips was over $5,000. By November, I had been able to secure authorizations for only 66 prisoners from family members, roughly one tenth of those in Guantanamo Bay at the time. At this rate, ensuring that all the prisoners had meaningful access to counsel was going to be prohibitively expensive, and unacceptably slow. There had to be another, more efficient way to get the prisoners the legal assistance that they so badly wanted.

77.     However difficult it is to locate the family members, it should be emphasized that virtually every family wants to secure free legal assistance for their loved ones, thereby sharing a community of interest with the prisoner next friends we subsequently used. To this day I have never located a friend or family member of a

prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

### Ultimately, It Became Possible to Cut Out the Need for International Travel and Secure Authorizations from Guantanamo Bay

78.    In November 2004, I was first able to visit two clients in Guantanamo Bay. This was a great relief, because it opened up a new avenue for helping the prisoners get counsel.

79.    My clients told me that other prisoners desperately wanted counsel and asked me how they could help. My initial idea was to write out a form that my clients could take back to their cells and use as the format for other prisoners. If other prisoners wanted me to help them, they could write out the form and send it to me. However, this proved ineffective. One client I had at the time was not well educated, and found it hard to understand how to go about it.

80.    We also had to contend with the unacceptable legal mail system from Guantanamo Bay. I have my clients keep logs of the letters that they send me, and the ones they receive from me. The letters that my clients send to me either do not get through at all, or take an unacceptably long time arriving. Via this method, I only received four signed requests for counsel, and those did not come through the mail to me until *May 29, 2005*, five months after they had been sent.

### The Next Friend Petitioners Relied on the Representations or Promises Made by the U.S.

81.    Thus, by early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

82.    One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

83.    To set this in context, the Center for Constitutional Rights (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

14

84.    The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You **may ask a friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member **or a friend** who could file this petition for you, you may file your own petition.

*Exhibit A* to *Declaration of Frank Sweigard* (filed with *Respondent's Motion*) (italics in original; bold emphasis supplied).[2]

85.    It should be noted that Respondents did not begin to provide this notice to the prisoners until December 2004, roughly six months after the Supreme Court identified the prisoners' right to file for habeas corpus. *Declaration of Frank Sweigard, at ¶3*. Why this was delayed so long is not explained.

86.    However, virtually every prisoner should, at this stage, have been provided with the information in *Exhibit A* in one form or another – either orally or in writing, either in English or Arabic, or some other language. I have discussed this document with some of my clients, and they have understood this to mean that they could file a request for legal assistance for their 'friends' in Guantanamo Bay.

87.    It is difficult to see how the Respondents can expect to craft and circulate this notice, and then argue that 'friends' in Guantanamo Bay cannot file a next friend petition. Indeed, under the ECN, the prisoner is not told that his first alternative is to file a petition himself: The default alternative is to have a friend file a petition, and only if there is no available friend is the prisoner told that he 'may' file a petition on his own. Therefore, from the prisoners' perspective, this is not an issue of whether another prisoner may act as 'next friend' – but simply whether the U.S. Military is going to be held to its promise.

88.    The prisoners certainly have no way of having a lawyer act as next friend and most prisoners would rather have a fellow prisoner as 'next friend' than a family member. For example, one of my British resident clients, Jamal Kiyemba, has stated in an unclassified document that "[t]he prisoners want to know why they have to have a family member contacted on this. It's personal. They think this is just a way of dragging their families into this process, putting them at risk. This is particularly true when the

---

[2] The identical language appears in the other 'Notifications'. *See Exhibits B & C* to *Declaration of Frank Sweigard*. For identical language in another similar form provided to the prisoners, *see also* Exhibit E, attached to *Declaration of First Lieutenant Wade M. Brown* (filed with *Respondent's Motion*).

15

family is in a repressive society back home. What is the point of having a family member involved?"

89.    Based on this, various of my clients have wanted to act as next friends for other prisoners with whom they have become friendly while in the prison. I have asked them to be sure that the prisoners for whom they act desire legal assistance. (I refer to these prisoners as 'prisoner next friends.')

## The Special Problems of Camp Echo

90.    It is unrealistic – and, given that Respondents are holding our clients incommunicado, unreasonable -- for Respondents to pretend that the prisoners can easily secure the legal assistance they desired.

91.    It is not easy for any prisoner to secure help, but it is next to impossible for some who are held in certain areas. Camp Echo has been one example, and prisoners there continue to have problems, although it is used now mainly for client legal visits.

92.    On one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. Lowery when a man who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. Lowery allowed me to speak to him, and he said that he "desperately want[ed] a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified so that I could execute my own statement as the basis for filing a petition for a writ of habeas corpus on his behalf.

93.    Not only is it difficult for prisoners to get help in Camp Echo, but Respondents make it very difficult for them even to have a friend in the prison to file on their behalf. As Jamal Kiyemba notes, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other prisoner, or you are punished. . . ."

## The Special Problems of Camp V and Level 2, 3 & 4 Prisoners

94.    Camp V has now taken over from Camp Echo as the solitary confinement camp, and the prisoners are not meant to have any contact there. The prisoners in Camp V, and those who have been held in restrictive custody of other kinds, face other problems.

95.    Camp V prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel. More important, those in Camp V, and those in restrictive levels, are not allowed pen and paper. Respondents suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' Motion, at 7 n.4.* For these prisoners, this is just not true, according to the reports of my clients.

96.    According to the unclassified information that I have secured from my clients, "particularly with levels 3 & 4 [prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel." This has been confirmed by my own experience. When I met with my prisoners on one visit, the Sergeant at Camp Echo said that the prisoners could not have a pen except when I was present with them. Clearly, it is impossible for prisoners to represent themselves without a pen.

### Other Military Interference with the Right to Counsel

97.    One issue raised by Respondents is whether my clients have a community of interest with the other prisoners such as to justify their acting as 'next friends.' It is very hard to see how any rational person would not want assistance in vindicating his rights. To the limited extent that some prisoners are mistrustful of American lawyers who volunteer to help them, this is almost exclusively attributable to the manipulative strategies adopted by Respondents and their personnel.

98.    It should always be remembered that the Military could easily have solved all of these problems. All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it. Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

99.    Far from making counsel available, Respondents have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the military has sometimes made a practice of taking the prisoners over there long before they are needed.

100.    As one of my clients, Jamal Kiyemba, has explained in unclassified materials:

> "Camp Echo is the most lonely place on earth. Last time I had a legal visit, I was all alone for ten days. They brought me over there, they would not let me take my Koran, and they put me in an isolation cell with nothing. There is no way to talk to any other prisoner, you're not meant to talk to the guards. There is a camera and microphones in the cell to make sure this is obeyed. The camera seems to shrink the cell, and make you paranoid. * * * There is no communal

17

> prayer. Showers and recreation were greatly limited – I got
> to go into the outside cell once for half an hour in six days,
> and got one shower. In [Camp] Delta I get outside [e]very
> day, and have a shower every day. If I complain [about
> Camp Echo], I am told that it is the lawyer's fault. If I did
> not have to come for a legal visit, I would not be treated like
> this."

101.    I have kept a log of when my clients were brought over to Camp Echo for
visits, and when they left after my visit. When I was in Guantanamo in May, two of my
clients were brought over to Camp Echo five days before my scheduled meeting, one
eight days early and one *eleven* days early. I learned on my subsequent trip that one of
my clients was held in solitary confinement in Camp Echo for *eleven* days after I met
with him. There is no imaginable security reason for this; however, it was a huge
imposition on my clients' right to meet with their attorneys.

102.    There have also been other consistent and troubling steps taken by the
Military to frustrate the right to counsel. On a basic level, the prisoners have a hard time
believing that the lawyers are for real because (due to Respondents' opposition to counsel
visiting) it took almost three years for them to begin to come to the prison. How, the
prisoners ask, can this be a legitimate legal system if the lawyers did not come all that
time? It strikes the prisoners as more likely that the lawyers are simply the next devious
step in the interrogation system.

103.    This impression is radically enhanced by the Military's deceitful practices.
My unclassified notes reflect that several prisoners have told me that investigators have
impersonated lawyers in an effort to get prisoners to talk. More recently, a juvenile
prisoner explained to me how the interrogator had boasted about her experience in the
U.S. Supreme Court and what she was going to do for the young man. Naturally, when
they learn that these 'lawyers' are actually interrogators, this makes the prisoners loathe
to believe that we are really lawyers on their side.

104.    The interrogators consistently tell prisoners that the lawyer's advice is
wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it
less likely that the prisoner will get out.

105.    Not one of my clients believes that attorney-client discussions are
confidential, and there have been suggestions that the Military does monitor supposedly
privileged hearings. Certainly, the Military has tried to interrogate the prisoners about
what they discussed with their lawyers. With more than one of my clients, after I left, the
interrogators sought to question them about their privileged discussions with me.

106.    As one prisoner said:

> "We all know that everything we say in these rooms is
> being monitored by them, and every time we say that we

> particularly hated being treated in a particular way, we
> know that this will later be used against us. There are
> constant examples of this. Last time my lawyer was here, I
> told him that I did not like being spoken to by my ISN
> number all the time, because it was so dehumanizing. * * *
> When I got back to my cell, they suddenly started doing
> this a whole lot more. And other things I just don't want to
> mention."

Regardless of whether the Military does violate the order of the court, the prisoners all
believe they do – a belief based on the consistent deceit and manipulation that the
Military has practiced.

107.    The requirement that everything said to counsel has to be subjected to
review before counsel can speak publicly about it is also a basis for creating mistrust with
the prisoners. As Jamal Kiyemba said to me, "[w]hat am I meant to think of my
Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?"

### Inadequate Descriptions of Legal Rights

108.    Respondents suggest, via the declaration of Frank Sweigart, that they have
"notified each detainee at Guantanamo Bay of his right to file a petition for habeas
corpus, and has provided each detainee with the address of the United States District
Court in the event that he desires to submit his own petition to the Court." *Respondents'
Motion, at 7.*

109.    It would be inappropriate to rely on the Enemy Combatant Notification as
sufficient to ensure that the prisoners will get the legal assistance that they need. To my
knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a
result of the ECN notice.

110.    The prisoners are not even consistently allowed a copy of the ECN to
study. For example, according to reports of my clients that have been unclassified, Omar
Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed
it briefly, and Shaker Aamer was able to keep his copy.

111.    The ECN states that the Assisting Military Officer (AMO) will help the
prisoner to understand his right to file for habeas corpus. ("Please talk to your Assisting
Military Officer if you have any questions about this notification. Your Assisting
Military Officer will meet with you later."). However, in my experience this is simply
not done – certainly not on any systematic level.

112.    None of my clients have ever heard of an AMO. They have heard of a
Personal Representative (PR). Yet, setting aside the ethical propriety of the Military
encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided
inadequate 'advice' in the cases with which I am familiar.

19

113.    Omar Deghayes received only one visit from a PR (with respect to the CSRT), and he received no meaningful assistance. Mr. Deghayes thought the PR was an interrogator (he was even told he had a "Reservation," the euphemism for interrogation), the PR would not give Omar his name, would not have his handcuffs taken off, only met with him for about ten minutes total, and did not tell him until well into the meeting that he was the PR. *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et all. v. Bush), at 4-5 (filed April 1, 2005)*. Such advice as Mr. Deghayes sought was not given. The PR did not, or would not, tell him whether there as any point attending the CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind of tribunal it would be, or how he might secure witnesses. *Id. at 5*. Neither could Mr. Deghayes get an answer as to how he could file a statement or secure witnesses when (as a Level 3 or 4 prisoner) he could not have a pen and paper.

114.    In another instance, Shaker Aamer had one meeting with a PR, and that was prior to his CSRT. His PR told him:

> "I'm not a lawyer. I'm more of a middle man. I'm not here to help you. I cannot give you any advice. I'm just here to take what you want to send to the [CSR] tribunal."

115.    According to Jamal Kiyemba when, prior to my being able to visit him, he asked for help understanding the habeas process, he found that "the advice is incomprehensible. The officers [PR/AMO] who are meant to explain the habeas corpus process to us do not know."

116.    Since meeting with my clients, I have instructed them to request to meet with the PR/AMO on a regular basis as they have to present a meaningful case to their ARB. I provided my clients with a list of suggested questions that they might ask about the ARB, as well as the habeas process. To my knowledge, to date, no PR/AMO has responded to the request of *any* of my clients for a meeting, let alone to provide this information.

### Problems Stemming from the Different
### Cultures and Languages of the Prisoners

117.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic.

118.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*." (emphasis in original). Recently, a very sophisticated graduate of Oxford University asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-

American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education or a person from a country with a wholly different legal system will do so.

119.    To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know.  Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face great problems seeking legal assistance on his own.

### Problems Counsel Would Face in Getting More Information
### About a Prisoner Without Being Able to Meet with that Prisoner

120.    To the extent that Respondents insist that more information be supplied by the next friends about the prisoners who they would like to assist, this would cause a tremendous delay in securing legal assistance for the prisoners.

121.    The timing of Respondents' motion is perplexing to me.  Hitherto, Respondents' counsel have contacted me on more than one occasion to seek my assistance to flesh out information about prisoners, when they were having difficulty identifying the prisoner in a particular petition.  For example, in one e-mail, counsel for Respondents asked me as follows:

Clive,

When you speak to Messrs. Deghayes and Kiyemba this week, please ask them to provide more information about the detainees on whose behalf they purportedly acts as next friends.  ISN numbers would be best.  At this point, based on the information in the petitions, we have not been able to identify the following petitioner names with actual detainees at GTMO:

Mohammed al Nadour (Inram v. Bush) (Deghayes)
Mohammed Fahreo (Inram v. Bush) (Deghayes)
Mohamad Morotany (Sliti v. Bush) (Deghayes)
Mohmoud Al Soury (Sliti v. Bush) (Deghayes)
Ahmed Doe (Ahmed Doe v. Bush) (Deghayes)

Abdusabuy Doe (Kiyemba v. Bush)
Abdusamad Doe (Kiyemba v. Bush)
Abdunasir Doe (Kiyemba v. Bush)
Hammad Doe (Kiyemba v. Bush)
Hudhaifa Doe (Kiyemba v. Bush)
Jalaal Doe (Kiyemba v. Bush)
Khalid Doe (Kiyemba v. Bush)
Saabir Doe (Kiyemba v. Bush)
Saadiq Doe (Kiyemba v. Bush)

Thanks,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084

122.    While I was under no obligation to do this, I tried to cooperate with Respondents. Indeed, since Respondents seemed to be having the most trouble with the Turkestanis, I wrote up a memo to Mr. Warden identifying the prisoners and providing cell locations and other information, to help Respondents identify prisoners who, after all, have been in Respondents' custody for more than three years. I did the best I could on this, even though Respondents refused to reciprocate by providing me with a table of prisoners that could radically assist me in this task.

123.    It is perplexing that the only person on the list provided by Mr. Warden who is subject to this motion is Ahmad Doe. I should note that I do not have unclassified all of my notes yet, and have not been able to determine whether I got additional information about Mr. Doe that could help on this point. But for reasons best known to themselves, Respondents did not ask me to get additional information with respect to the other six petitions challenged in their motion.

124.    Respondents knew that I was in Guantanamo between August 4th and 14th, yet they filed their motion after I had returned, and I will not be going back down there until mid-October (assuming that they permit a visit then). It would be November at the earliest that I could therefore get additional information about these clients, delaying their legal rights even more.

125.    Since I cannot go sooner, I consent to counsel for the other prisoners speaking with my clients, where relevant, on a visit to Guantanamo Bay to secure this information before I am able to visit again.

### Checks Already in Place if Prisoners
### Decide They Do Not Want Lawyers

126.    There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner.

127.   This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

## Background of Declarant

128.   For informational purposes, I will provide a limited resume of my experience in this area.

129.   I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

130.   Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004. The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South. I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

*131.*   Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per cuiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

132.   I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

133.   Because of the importance of effective counsel in a meaningful judicial system, I have taken an very active role in systematic litigation on behalf of the right to counsel. This has included a class action on the right to counsel in capital post-

conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

134.    I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

135.    I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

136.    I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, MS, 1993).

137.    In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity. For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

138.    I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

139.    I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991).

140.    I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for the next five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote all of my time to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest. My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation. I have assumed this role solely because the work so obviously needed to be done. I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

141.    I am now based in the United Kingdom. I have dual U.S. and U.K. nationality.

## Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this 12th day of September, 2005, in London, England.

CLIVE A. STAFFORD SMITH