# U.S. SENATE COMMITTEE ON
# BANKING, HOUSING, AND URBAN AFFAIRS

## Subcommittee on International Trade and Finance

Hearing on "The Role of Charities and NGOs in the Financing of Terrorist Activities."

Prepared Statement of Mr. Matthew A. Levitt
Senior Fellow
Washington Institute for Near East Policy

2:30 p.m., Thursday, August 1, 2002 - Dirksen 538

## I. INTRODUCTION

The synchronized suicide attacks of September 11 highlighted the critical role financial and logistical support networks play in the operations of international terrorist organizations. According to financial profiles released by the FBI, the attacks cost an estimated $500,000. Unfortunately, the network of international terrorist financing is both established and sophisticated.

The investigative value of following the trail of terrorist financing has long been known. Then-FBI Director Louis Freeh testified before Congress in 1999 that a shortage of funds prevented the 1993 attack on the World Trade Center from being as devastating as it otherwise could have been. After his capture in 1995, Ramzi Yousef, the convicted mastermind behind the 1993 bombing and other attacks, admitted that the terrorists were unable purchase sufficient material to build as large a bomb as they had intended because they were strapped for cash. In fact, the operation itself was rushed and carried out earlier than planned because the cell simply ran out of money. In the end, the terrorists' attempt to reclaim the deposit fee on the rental truck used to transport the bomb provided a key break in the case.

The al Qaeda suicide hijackings underscored the post-blast, investigative utility of tracking the money trail, but they also drove home the critical need to preemptively deny terrorists the funds they need to conduct their attacks. Early financial leads in the September 11 investigation established direct links between the hijackers of the four flights, identified co-conspirators, and led investigators to logistical and financial support cells in Germany and elsewhere in Europe as well as in the Gulf. Financial leads led investigators to key al-Qaeda operatives and money-men such as Ramzi Bin al-Shibh in Germany and Mustafa Ahmed al-Hasnawi in the United Arab Emirates. Financial analysis provided some of the earliest evidence proving the synchronized suicide hijackings were an al-Qaeda operation, and linked the German cell, the hijackers, and Zacarias Moussaoui. Wire transfers between Moussaoui and Bin al-Shibh played a crucial role leading to Moussaoui's indictment for his role in the attacks. Financial investigation also established links between Moussaoui and members of the al-Qaeda associated cell of Jama'ah al-Islamiah terrorists arrested in Malaysia.

Effective though it may be, stemming the flow of terrorist financing will not stamp out terrorism. In fact, unlike Polio or Small Pox, terrorism cannot be eradicated. There will always be grievances, causes, conditions that, coupled with a healthy dose of evil, will lead people to target civilian noncombatants for political purposes or even as a means in itself. The primary responsibility of all states, however, is to protect their citizenry, and to that end it is incumbent upon all

states to employ the full range of protective, deterrent, and preventive counterterrorism measures available in an effort to provide for the security of its populace. The fact that terrorism cannot be eliminated does not absolve states of the responsibility to fight it as vociferously as possible.

In this regard, tackling terrorist financing represents a critical and effective tool both in reacting to terrorist attacks and engaging in preemptive disruption efforts to prevent future attacks. Often, as was the case in the investigation of the September 11 attacks, financial transactions provide the first and most concrete leads for investigators seeking to flush out the full scope of a terrorist attack, including the identities of the perpetrators, their logistical and financial support networks, links to other terrorists, groups and accomplices. Since September, the U.S. government has spearheaded a groundbreaking and comprehensive disruption operation to stem the flow of funds to and among terrorist groups. Combined with the unprecedented law enforcement and intelligence effort to apprehend terrorist operatives worldwide, which constricts the space in which terrorists can operate, cracking down on terrorist financing denies terrorists the means to travel, communicate, procure equipment, and conduct attacks.

## II. THE NETWORK OF TERRORIST FINANCING

Cracking down on terrorist financing demands an all-encompassing approach to have any chance of successfully disrupting terrorist activity, targeting the full array of groups, individuals, businesses, banks, criminal enterprises and humanitarian organizations that finance terrorism.

At the most macro level, financial blocking orders must include the terrorist groups themselves in an effort to seize any funds they may have in their own name. Realistically, terrorist groups tend not to open bank accounts under their organization's name, especially in the West. Nonetheless, the message is important, and there are in fact cases, such as Hizballah in Lebanon, where groups operate openly and have accounts in their own or other known names. More significantly, listing the groups themselves subjects other entities that support them to scrutiny as well. Should the Islamic Action Front in Jordan or the Muslim Brotherhood in Egypt openly state their financial support for Hamas, for example, they could be subject to financial penalties themselves despite the fact that they are not listed in any of the terrorist lists published by the United States or others.

Individuals who support terrorism play a critical role in financing terror, highly disproportionate to their numbers. Unfortunately, a few wealthy individuals are able to sponsor much terror. For example, Mustafa Ahmed al-Hasnawi, the Saudi national and bin Laden money man, sent the September 11 hijackers operational funds and received at least $15,000 in unspent funds before leaving the UAE for Pakistan on September 11. According to U.S. officials, Yasin al-Qadi, a prominent Jedda businessman and the head of the Muwafaq Foundation, has supported a variety of terrorist groups from al-Qaeda to Hamas. According to U.S. court documents, in 1992 al-Qadi provided $27,000 to U.S.-based Hamas leader Muhammad Salah and lent $820,000 to a Hamas front organization in Chicago, the Quranic Literacy Institute (QLI). Based on their connection to Hamas, the U.S. government has frozen the assets of both Salah and QLI. Similarly, U.S. officials maintain that the Muwafaq Foundation is a front organization through which wealthy Saudis forward millions of dollars to al-Qaeda. In another example, Israeli authorities arrested Osama Zohadi Hamed Karika, a Hamas operative, as he attempted to leave Gaza via the Rafah border crossing in December 2001. Karika was found with documents detailing the development of the Qassam rockets, and admitted under questioning that he was on his way to Saudi Arabia to brief unidentified persons on the development of the rockets and to obtain their funding for the project. Before his arrest, Karika had already made one successful trip to Saudi Arabia where he secured initial funding for Hamas' Qassam rocket program.

Investigation into al-Qaeda sleeper cells in Europe in the wake of September 11 revealed the widespread use of legitimate businesses and employment by al-Qaeda operatives to derive income to support both themselves and their terrorist activities. According to Congressional testimony by a senior FBI official, a construction and plumbing company run by members of an al-Qaeda cell in an unnamed European country hired *mujahadin* (holy warriors) arriving from places like Bosnia where they had fought what they considered a *Jihad* (holy war). Cell members ran another business buying, fixing and reselling used cars, and in these and other examples cell members deposited their

legitimate salaries, government subsidies, supplemental income from family members, and terrorist funds received by cash or wire transfer into the same one or two accounts.

International and unofficial banking systems have also played a role in terrorist financing. For example, the Treasury Department froze the assets of 62 organizations and individuals associated with the al-Barakat and al-Taqwa financial networks in November 2001. Federal agents raided these groups' offices across the United States, and subsequently in Europe and the Bahamas as well. In his remarks at the time, President Bush stated that the two institutions provided fundraising, financial, communications, weapons-procurement, and shipping services for al-Qaeda. A few months later, Deputy Assistant Secretary of the Treasury Department Jamie C. Zarate testified before Congress that "in 1997, it was reported that the $60 million collected annually for Hamas was moved to accounts with Bank al Taqwa". Al-Taqwa shareholders reportedly include known Hamas members and individuals associated with a variety of organizations linked to al-Qaeda. A 1996 report by Italian intelligence reportedly further linked al-Taqwa to Palestinian groups, the Algerian Armed Islamic Group (GIA) and the Egyptian Gama'at al Islamiyah.

Criminal enterprises have also serviced the spread of terrorism, especially as central nodes in the matrix of terrorist financing. Ahmad Omar Sayed al-Sheikh, now on trial for the abduction and murder of Wall Street Journal Reporter Daniel Pearl, linked up with Aftab Ansari, a prominent figure in the Indian mafia, to provide al-Qaeda with recruits, false documents, safe-houses and proceeds from kidnappings, drug trafficking, prostitution and other crime. Officials in the Balkans are equally concerned about developing links between terrorism and mafia activity in Chechnya and other parts of the Caucuses spreading to Albania, Bosnia and beyond Southern Europe. Authorities in Belgium have issued an arrest warrant for Victor Bout, a notorious arms trafficker suspected of supplying weapons to the Taliban and al-Qaeda as well as warring factions throughout the African continent in an elaborate guns-for-diamonds scheme. Al Qaeda and The Revolutionary Armed Forces of Columbia (FARC) each raised millions of dollars in drug money to support their operations. Smuggling, kidnapping and extortion are also well-established techniques employed by various terrorist groups. For example, Mohammed and Chawki Hamoud are currently on trial in Charlotte, North Carolina, on a variety of charges including funding the activities of Hizballah from the proceeds of an interstate cigarette smuggling ring. Seven other defendants have already pled guilty to a variety of charges stemming from this case, including conspiracy to provide material support to terrorists, cigarette smuggling, money laundering and immigration violations.

Each of these trends is significant in its own right, and all the more so when applied in tandem. Humanitarian organizations, however, have played a particularly disturbing role in terrorist financing, and present a especially sensitive challenge as authorities are faced with discerning between legitimate charity organizations, those unknowingly hijacked by terrorists who divert funds to finance terrorism, and others proactively engaged in supporting terrorist groups. A key challenge that arises in this regards as governments balance the need to share information linking such organizations to terrorism in against the cost of exposing intelligence sources and methods.

## III. CHARITABLE AND HUMANITARIAN ORGANIZATIONS

Long before September 11, officials were aware that financial networks of charitable and humanitarian organizations were financing terror. Investigators looking into the 1993 World Trade Center attack traced funding for the operation back to a company that imported Holy Water from Mecca to Pakistan. In 1997 Canada cut all government funding to Human Concern International, a Canada-based charity then under investigation in both Canada and the U.S., for the group's "terrorist connections."

Only now, however, is the trend receiving the attention it deserves. Ambassador Francis X. Taylor, the State Department's Coordinator for Counterterrorism, recently noted that "any money can diverted if you don't pay attention to it. And I believe that terrorist organizations, just like criminal enterprises, can bore into any legitimate enterprise to try to divert money for illegitimate purposes." While such manipulation is a tremendous concern, an even more disturbing trend has become evident in the efforts of some charitable and humanitarian organizations to knowingly and proactively raise funds for terrorist groups. Often, leaders of such organizations raise funds both from individuals

seeking to fund terrorist groups as well as innocent contributors unwitting of the groups' links to terrorists.

**Financing Terrorism**

On December 14, 2001, federal officials raided the offices of the **Global Relief Foundation** in Chicago and froze its assets. The group's offices in Kosovo were raided by NATO forces a few days later after NATO was provided "credible intelligence information" that the group was "allegedly involved in planning attacks against targets in the U.S.A. and Europe." Global Relief raised more than $5 million in the United States last year. While much – perhaps most – of these funds likely went to legitimate causes, investigators maintain that the organization served as an important front organization for al Qaeda. Ongoing international terrorism investigations have raised further reason for concern. For example, according to information provided by the Spanish Interior Ministry, a senior bin Laden financier arrested in Spain, Mohammed Galeb Kalaje Zouaydi, transferred to several individuals linked to the bin Laden network, including $205,853 to the head of the Global Relief office in Belgium, Nabil Sayadi (alias Abu Zeinab).

While September 11 highlighted the Al-Qaeda terrorist network, bin Laden and his terrorist affiliates are by no means the only groups using humanitarian organizations to finance their terrorist activities.

On January 4, 2001, FBI agents and New York City police raided the **Hatikva Center,** a community center in Brooklyn run by followers of Rabbis Meir Kahane and Benjamin Kahane, father and son and founders of the Jewish terrorist groups Kach and Kahane Chai, respectively. The underlying affidavit supporting the search warrant were sealed, but it is clear officials seized a trailer full of material searching for evidence the organization was providing material support to either Kach or Kahane Chai, both of which are designated Foreign Terrorist Organizations by the U.S. Department of State.

More recently, on December 4, 2001, the Bush administration exposed the **Holy Land Foundation for Relief and Development** as a front organization for Hamas. According to its year 2000 tax return, Holy Land Foundation (HLF) total revenue exceeded $13 million. In a detailed 49-page memorandum, the U.S. government established that these funds were used by Hamas to support schools and indoctrinate children to grow up into suicide bombers. Money raised by the Holy Land Foundation was also used by Hamas to recruit suicide bombers and to support their families. Five days before the September 11 attacks, the FBI raided the offices and froze the assets of Infocom, an Internet company that shares personnel, office space, and board members with the Holy Land Foundation, officials said. The two organizations were formed in California around the same time, and both received seed money from Hamas leader and Specially Designated Terrorist Mousa Abu Marzook. The HLF relied heavily on local *zakat* (charity) committees in the West Bank and Gaza to funnel funds to Hamas. The FBI memorandum establishes that known Hamas activists ran the *zakat* committees in question, in whole or in part. For example, the memorandum reported that a financial analysis of HLF bank records indicated the foundation donated over $70,000 to the Tulkarm *zakat* committee from 1997 through 1999. Among the senior Hamas members affiliated with the Tulkarm *zakat* committee are Hamas Mohmammed Hamed Qa'adan, head of the Tulkarm *zakat* committee, and Ibrahim Muhammad Salim Salim Nir Al Shams, a member of both the Tulkarm *zakat* committee and the Supreme Hamas leadership in Nur Al-Shams, among others. According to information provided by the Government of Israel, the Tulkarm *zakat* committee "exists to support Hamas activities."

A key Saudi charity linked to terrorist financing is the **al-Wafa Humanitarian Organization**. U.S. officials have described al-Wafa as a key component of bin Laden's organization. One official was quoted as saying that al-Wafa and other groups listed "do a small amount of legitimate humanitarian work and raise a lot of money for equipment and weapons." For example, Abdul Aziz, a Saudi citizen, senior al-Qaeda finance official, and Camp X-Ray prisoner, allegedly financed al-Qaeda activities through Wafa.

The U.S. offices of a number of Saudi organizations were raided in Northern Virginia in March 2002. Among others, the offices of the SAAR Foundation, the Safa Trust, and the International Institute for Islamic Thought (IIIT) were raided, most of which shared office space. The SAAR Foundation had recently closed, but was of particular concern

because of the close links between the Saudi Royal family its founder, the Saudi banker Shiekh SuleimanAbdel Aziz al-Rajhi (initials SAAR). Tarik Hamdi, an IIIT employee, personally provided bin Laden with the battery for the satellite phone prosecutors at the New York trial of the East Africa Embassy bombers described as "the phone bin Laden and other will use to carry out their war against the United States." Both SAAR and IIIT are also suspected of financing HAMAS and Palestinian Islamic Jihad (PIJ), including the World and Islamic Studies Enterprise (WISE) and the Islamic Committee for Palestine (ICP), PIJ fronts since closed in Florida.

The assets of both Ghaleb Himmat and the al-Taqwa banking network of which he is an executive have been frozen for links to terrorism. Himmat, reported in a German inteligence report to have expressed "pleasure" over the news of the September 11 attacks, is also a board member of the Geneva section of the Kuwiat-based International Islamic Charitable Organization (IICO). The IICO's Palestine Charity Committee (PCC), headed by Nader al-Nouri, sends its funds through "trusted *zakat* committees" in the Palestinian territories, many of which are linked to Hamas.

**Facilitating Terrorism**

Several charitable and humanitarian organizations have not only financed terrorist groups, but actively facilitated terrorist operations. Several humanitarian organizations such as the **Mercy International Relief Organization (Mercy)** played central roles in the 1998 U.S. embassy bombings. At the New York trial of four men convicted of involvement in the embassy attacks, a former al-Qaeda member named several charities as fronts for the terrorist group, including Mercy. Documents presented at the trial demonstrated that Mercy smuggled weapons from Somalia into Kenya, and Abdullah Mohammad, one of the Nairobi bombers, delivered eight boxes of convicted al-Qaeda operative Wadi el-Hage's belongings -- including false documents and passports -- to Mercy's Kenya office.

Along with Mercy, the Kenyan government also banned the International **Islamic Relief Organization (IIRO)** after the embassy bombings. From 1986 to 1994, bin Laden's brother-in-law, Muhammad Jamal Khalifa, headed the IIRO's Philippine office, through which he channeled funds to terrorist groups affiliated with al-Qaeda, including Abu Sayyaf. In November and December 2001, Philippine police arrested four Arabs associated with the Moro Islamic Liberation Front (MILF) and described them as an al-Qaeda "sleeper cell." Mohammad Sabri, one of the four men arrested, is a Palestinian who, according to Philippine police, worked closely with Khalifa in running the IIRO office. In January 1999, Indian police foiled a plot to bomb the U.S. consulates in Calcutta and Madras. The mastermind behind the plot was Sayed Abu Nasir, an IIRO employee who received terrorist training in Afghanistan. In 2001, Canadian authorities detained Mahmoud Jaballah based on an Interpol warrant charging him with being an Egyptian Islamic Jihad terrorist. In 1999, Canadian officials attempted to deport Jaballah based on his work for IIRO and what they described as IIRO's involvement in terrorism and fraud. The IIRO came up in the investigation into the September 11 attacks as well: hijacker Fayez Ahmed reportedly told his father he was going abroad to work for IIRO when he left for the suicide mission. Documents seized by Israeli forces during recent operations in the West Bank include records from the Tulkarm *zakat* committee, the same Hamas-controlled committee noted above, indicating that the IIRO donated at least $280,000 to the Tulkarm *zakat* committee and others Palestinian organizations linked to Hamas.

Like many other Saudi humanitarian organizations, IIRO is part of the **Muslim World League**, which is funded and supported by the Saudi government (in fact, the Muslim World League and IIRO share offices in many locations worldwide). A senior League official in Pakistan, Wael Hamza al-Jlaidan, is listed on the Treasury's terrorist financial blocking order list. In March 2002 the Northern Virginia offices of both the IIRO and Muslim World League were raided by a Treasury Department task force searching for evidence they were raising or laundering funds for al Qaeda, Hamas or PIJ.

The Treasury Department has frozen the assets of other Muslim World League member organizations suspected of funding terrorism, including the **Rabita Trust**. Rabita, which U.S. officials says changed its name to the Aid Organization of the Ulema, is based in Pakistan and actively raised funds for the Taliban since 1999.

The **Al Rashid Trust**, another group that funded al Qaeda and the Taliban, is closely associated with the al-Qaeda associated Jaish Mohammed terrorist group. Al Rashid has been directly linked to the January 23, 2002, abduction and subsequent brutal murder of *Wall Street Journal* reporter Daniel Pearl in Pakistan. The attackers, linked to a motley crew of domestic Pakistani radical Islamic fundamentalist groups (including Jaish) operating in cooperation with, and on behalf of, al Qaeda, held Pearl in a two-room hut in the compound of a commercial nursery owned by al Rashid. Several madrassas, or Islamic schools, under construction dominate the immediate area around the nursery, the largest and closest of which is owned by al Rashid. Pakistani investigators uncovered twelve telephone calls placed by one of the kidnappers, a rogue policeman named Sheikh Adil, to an unidentified al Rashid Trust employee. A British internet site called the Global Jihad Fund, which openly associates itself with bin Laden, provided the bank account information for al Rashid and other fronts and groups to "facilitate the growth of various Jihad movements around the world by supplying them with funds to purchase their weapons."

Last October, NATO forces raided the **Saudi High Commission for Aid to Bosnia**, founded by Prince Selman bin Abdul-Aziz and supported by King Fahd. Among the items found at the Saudi charity were before-and-after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the USS Cole; maps of government buildings in Washington; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. Six Algerians are now incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo, including an employee of the Saudi High Commission for Aid to Bosnia and another cell member who was in telephone contact with Osama bin Laden aid and al-Qaeda operational commander Abu Zubayda. Authorities are now trying to track down $41 million of the commission's missing operating funds.

In December, U.S. authorities raided the Chicago offices of another Saudi-based charity, the **Benevolence International Foundation**. The foundation's videos and literature glorify martyrdom, and, according to the charity's newsletter, seven of its officers were killed in battle last year in Chechnya and Bosnia. Four months later, the U.S. Embassy in Bosnia was shut down for four days on March 20, 2002, after Bosnian officials informed the embassy of a possible threat. Al Qaeda terrorists reportedly met in Sofia, Bulgaria, where they decided that "in Sarajevo something will happen to Americans similar to New York last September," according to a Bosnian official. The day before the Embassy closed its doors, Bosnian police raided the offices of an Islamic charity called Bosnian Ideal Future, which is the local name under which Benevolence International operated in Bosnia. Officials seized weapons, plans for making bombs, booby-traps and false passports. Two days before the Embassy reopened, Bosnian police arrested Munib Zahiragic, the head of the local Benevolence office and a former officer in the Bosnian Muslim secret police. Two weeks earlier, Bosnian officials investigating foreign humanitarian organizations reported funds were missing from the Bosnian office of Benevolence International.

Most recently, on April 30, 2002, the foundation's executive director, Enaam M. Arnaout, was arrested in the United States on perjury charges for making false statements in a lawsuit against the government. Contrary to his and the foundation's statements, the documents and cooperating witnesses indicated that Arnaout had a personal relationship with both bin Laden "and many of his key associates dating back more than a decade." In fact, Bin Laden trusted Arnaout enough to host one of bin Laden's wives at Arnaout's apartment in Pakistan where bin Laden later picked her up. Arnaout reportedly facilitated money and weapons transfers for bin Laden through the foundation. According to the government's affidavit, senior al-Qaeda operative Mamhoud Salim traveled to Bosnia on documents signed by Arnaout listing Salim as a director of the foundation. Mohamed Bayazid, a bin Laden operative involved in efforts to obtain nuclear and chemical weapons for al Qaeda, listed the foundation's address as his residence in his application for a driver's license. The foundation was established by a wealthy Saudi and bin Laden associate, Sheikh Adil Abdul Galil Betargy, who later transferred control to Arnaout.

## IV. DISRUPTING THE FLOW OF TERRORIST FINANCING

The phenomenon of terrorists funding their activities through charitable and humanitarian organizations, either as full-fledged front organizations or as unwitting accomplices, is clearly critical problem. Unfortunately, it can be equally

difficult to disrupt. Discriminating between legitimate and nefarious charities is extremely difficult, partly because front organizations do not hang a shingle on their door identifying themselves as terrorists and partly because they actively attempt to hide their financing of terrorism among some legitimate causes they fund as well. It is especially sad that the largest Islamic charity organization in the United States, the Holy Land Foundation, abused the trust of so many charitable Muslim-Americans seeking to do nothing more than relieve the hardships of their co-religionists and others suffering throughout the world.

While difficult, disrupting the flow of funds to terrorists is not impossible. Through analysis of the financial information collected on the September 11 hijackers and their accomplices in Europe and the Gulf, the FBI quickly developed a financial profile from the hijackers' bank accounts and financial activity. This included profiles of the domestic accounts, financial transactions, international financial activity and non-financial information gleaned from financial documents. Pattern analysis focused the direction of the ongoing international investigation toward specific countries, especially in Europe, and played a central role in the FBI's predictive effort to foil the terrorist attacks intelligence information indicated were still being planned.

Since September 11, the Bush administration has issued a series of financial blocking orders targeting terrorist groups, including terrorist organizations, front companies, and individuals. In total, the U.S. government has designated some 191 individuals, organizations, and financial supporters of terrorism as SDTGs from around the world, including over $34 million in terrorist assets. Other nations have reportedly followed the U.S. lead. The secretary of the treasury reported that 150 "countries and jurisdictions" have blocking orders in force, and have blocked more than $70 million in assets. According to U.S. officials, intelligence information indicates that terrorist operatives are finding it increasingly difficult to gain access to funds needed to escape the international dragnet targeting them, communicate effectively between cells in different parts of the world, and conduct further operations.

**International Cooperation**: Targeting a wide array of groups and organizations funding and transferring terrorist funds is critical, but must be conducted as part of a well-coordinated international effort. Many nations have followed the U.S. lead in this regard, blocking millions of dollars in terrorists' assets. This is a particularly sensitive issue, especially in the Middle East. In November 2001, for example, a senior US delegation went to Saudi Arabia to solicit greater cooperation in the arena of tackling terrorist financing. Secretary of the Treasury Paul O'Neill visited again three months later, agreeing to quietly broaching concerns regarding specific humanitarian organizations with Saudi officials before putting them on U.S. terrorist lists. The new tactic fits the mold of traditional U.S.-Saudi diplomacy, and quickly bore fruit: the U.S. and Saudi governments jointly froze the accounts of the Bosnian and Somali offices of the Saudi-based al-Haramain Humanitarian Organization just days later. Subsequent reports, however, already indicate that U.S. authorities are concerned that Saudi authorities are glossing over the terrorist connections of other humanitarian organizations, including the Wafa Humanitarian Organization, the International Islamic Relief Organization (IIRO) and its parent the Muslim World League.

**Gaining Saudi Support**: Saudi officials have at minimum a clear pattern of looking the other way when funds are known to support extremist purposes. One Saudi official was quoted as saying that an organization created to crack down on charities funding terrorism does little because "it doesn't want to discover top people giving to charities." Prince Bandar bin Sultan, the Saudi ambassador to the United States, acknowledged the problem of tracking the money trail in a New York Times/Frontline interview. Bandar stated that Saudi officials "found money leaves Saudi Arabia, goes to Europe and we can follow it, goes to the United States, America, and we lose contact with it."

The Saudis have taken steps to battle money laundering and freeze accounts related to the September 11 conspirators, and recently passed new regulations governing private fundraising. Saudis are now encouraged to donate funds in fulfillment of their *zakat* obligations only through established groups operating under the direct patronage of a member of the royal family. However, as the recent case in Bosnia attests, many of these groups are themselves suspected of financing terrorism.

Moreover, Saudi Arabia's calls for the U.S. to play a more engaged role in Middle East peacemaking appear to be self-

serving in light of it funding of terrorist groups that seek to undermine Israeli-Palestinian peacemaking like Hamas. Documents made public by Israel indicate not only that the Saudi Ministry of the Interior funded Hamas, but that it specifically highlighted the funding of families of "martyrs" who conducted "quality attacks" against Israeli civilians.

**Working with Europe:** Nor are divisions over terrorist financing exclusive to the Middle East. U.S. officials complain that European allies have contributed few names to the list of alleged terrorist financiers subject to financial blocking orders, that they have yet to act on all the names already on the list, and that those names European allies have added to the list are primarily domestic groups such as Basque and Irish groups. Europeans, in return, have repeatedly expressed their frustration with U.S. requests to add people or groups to terrorist lists while supplying insufficient evidence, if any.

On May 3, 2002, the European Union (EU) added eleven organizations and seven individuals to its financial-blocking list of "persons, groups, and entities involved in terrorist acts." Unfortunately, while the list marks the first time the EU has frozen the assets of non-European terrorist groups, it adopts the fallacy of drawing a distinction between the nonviolent activities of terrorist groups and the terror attacks that they carry out. By distinguishing between the terrorist and welfare "wings" of Hamas, for example, the EU lent legitimacy to the activities of charitable organizations that fund and facilitate terrorist groups' activities and operations.

**The American Bureaucracy:** Even within the U.S. intelligence and law enforcement community the financial war on terrorism has been hamstrung by bitter turf wars between the Departments of Treasury and Justice. The Departments have reportedly launched parallel task forces that do not communicate or share information.

While disconcerting, operational inefficiency and territorialism between agencies pales in comparison to the more strategic gap in policymaking circles. Cracking down on terrorist financing, especially in the case of charitable and humanitarian organizations that camouflage their funding of terrorism by funding legitimate groups and causes as well, requires a political will that was markedly absent until September 11. Terrorist financing through charitable organizations is not unique to Islamic charities, per se, but the fact is that the majority of terrorist groups operating in the world today and targeting the United States are of the radical Islamic variety. Radical Islamic terrorists dominate the U.S. government's various terrorist lists, and it therefore stands to reason that the majority of charitable organizations engaged in terrorist financing are Islamic organizations. While these investigations should be conducted in a careful and judicious fashion, sensitive to the fact that while some organizations are front organizations for terrorist groups other are unwittingly hijacked by rogue individuals, they should not be confused with "Muslim bashing."

## V. Conclusion

Terrorism will always exist, which is why there is no exit strategy to fighting terrorism. Counterterrorism is a form of conflict management, not conflict resolution. To bear any fruit, counterterrorism techniques must be as comprehensive, ongoing, and cooperative as possible. Cracking down on terrorist financing will only succeed in dismantling terrorist groups' logistical and financial support networks, and by extension preventing terrorist attacks, if the governments and agencies involved in the effort act in concert and, at a minimum, mirror the resolve, commitment and dedicated displayed by the terrorists.